1
2
3
4
5
6
7
8              **UNITED STATES DISTRICT COURT**
9             **SOUTHERN DISTRICT OF CALIFORNIA**
10

11   MANAL NAOOM d/b/a L.T.M.              CASE NO. 05-CV-1207 H
     AUTO SALES; et al.,                   (CAB)
12
                            Plaintiffs,    **MEMORANDUM DECISION
13        vs.                              ON ACCOUNTING**
14   SECURED ASSETS INCOME
     FUNDS, an unknown entity; et al.,
15
                            Defendants.
16
17   ─────────────────────────────
     SAIF, INC., a California corporation,
18
                            Counter-Claimant,
19
          vs.
20
     MANAL NAOOM d/b/a L.T.M.
21   AUTO SALES; et al.,
22                          Counter-Defendants.
     ─────────────────────────────
23

24        The Plaintiffs remaining before the Court are: (1) Manal Naoom (d/b/a L.T.M.

25   Auto Sales); (2) Afshin Kashani (d/b/a Auto Finance Group); (3) Auto Finance Group,

26   Inc.; (4) Parviz Ghadimi (d/b/a M.P. Motors); and (5) Mehran Khomamizadeh (d/b/a

27   Car Mart) (collectively, "Plaintiffs").  Plaintiffs filed the Third Amended Complaint on

28   May 15, 2006.  The remaining Defendants are Secured Assets of California, SAIF, Inc.,

                                    - 1 -

and Thomas Sterling.   In their remaining claims, Plaintiffs seek an accounting, declaratory relief, injunctive relief, and they seek to recover for usury and under RICO.

In its summary judgment order, the Court ruled that SAIF, Inc. may enforce the various agreements as successor in interest.  The Court also ruled that Plaintiffs Manal Naoom, Afshin Kashani, Parvis Ghadimi, Mehran Khomamizadeh, and Javad Mousavinia, and Counterdefendant Nashat Naoom breached the agreements set forth in Claims I through X of SAIF, Inc.'s countercomplaint as to unpaid principal.  Further, the Court ruled in the summary judgment order that Plaintiffs are entitled to an accounting of the amounts due under the agreements, and the Court bifurcated the accounting from the remaining causes of action for trial.

The Court held the trial on the accounting beginning on November 21, 2006 and concluding on November 30, 2006 to determine the amounts that each Plaintiff currently owes to SAIF, Inc.  Robert Reynolds and Richard Miller appeared for Plaintiffs, and Richard Van Dyke appeared for Defendants.  The Court heard testimony from Thomas Sterling, Khasrow Alex Baghaei, Manal Naoom, Danielle Rauto, Emebet Selassie, Mark Daniel Close, Afshin Kashani, and Parviz Ghadimi.  The court received into evidence hundreds of exhibits.   After hearing the evidence, evaluating the credibility and demeanor of the witnesses, reviewing all of the exhibits, and carefully considering the arguments of counsel, the Court finds:

1.     Manal Naoom (d/b/a L.T.M. Auto Sales) is liable to SAIF, Inc. in the amount of $117,393.66;

2.     Afshin Kashani (d/b/a Auto Finance Group) is liable to SAIF, Inc. in the amount of $157,794.22;

3.     Parviz Ghadimi (d/b/a M.P. Motors) is liable to SAIF, Inc. in the amount of $206,008.74, potentially offset by any credit for amounts deposited with the Court if appropriate; and

4.     Mehran Khomamizadeh (d/b/a Car Mart) is liable to SAIF, Inc. in the amount of $255,105.00.

The Court has requested further briefing on prejudgment interest and attorneys' fees, and will request briefing or documentation on the potential offset.

### Accounting

"An action for an accounting . . . is a proceeding in equity for the purpose of obtaining a judicial settlement of the accounts of the parties in which proceeding the court will adjudicate the amount due, administer full relief and render complete justice[.]" Verdier v. Superior Court, 199 P.2d 325, 327 (Cal. Ct. App. 1948).  An accounting is typically a two step process.  After determining the right to an accounting, the court either refers the matter for an accounting or conducts the accounting itself. See, e.g., 1A C.J.S., Accounting, §§ 45, 47; 1 Am. Jur. 2d, Accounts and Accounting, § 66.  Accordingly, having found that Plaintiffs are entitled to an accounting, the Court proceeds to adjudicate the amounts due to SAIF, Inc.

To arrive at the amount each Plaintiff owes to SAIF, Inc., the Court must combine the amount of unpaid principal with interest and fees, and then offset any usury.  As noted below, the parties agree on the universe of checks that passed between each Plaintiff and SAIF, Inc. and on the absolute amounts of principal, interest, and fees, but Plaintiffs claim that the vehicle inspection and account servicing fees are really usurious interest charges.  Accordingly, after describing SAIF, Inc.'s lending program and the documents executed by each of the dealers, the Court will address the issue of usury.

### 1.    SAIF, Inc.'s Inventory Financing Program

Thomas Sterling testified credibly that SAIF, Inc. conducted an inventory financing program, also referred to as a flooring program, which was intended to provide short term loans to used car dealers to finance inventory.  Sterling and Khasrow Alex Baghaei, SAIF, Inc.'s account manager during most of the time period in question, testified that SAIF, Inc. would loan up to 80% of the wholesale value of each vehicle as stated by the Kelley Blue Book.  The dealers would provide titles to SAIF, Inc. as collateral for the loans.  The loans did not contain amortization of principal, but were

for interest and fees only.

The credible evidence showed that SAIF, Inc. and each new dealer would execute several documents at the beginning of the lending relationship. Each new dealer would execute a security and buy back agreement, a promissory note, and a personal guarantee. (Security and buy back agreement, promissory note, and personal guarantee for: Manal Naoom and L.T.M. Auto Sales, Defs.' Exs. A, B, & D; Afshin Kashani and Auto Finance Group, Defs.' Exs. M, N, & O; Parviz Ghadimi and M.P. Motors, Defs.' Exs. X, Y, & AA; and Mehran Khomamizadeh and Car Mart, Defs.' Exs. AJ, AK, & AM) As the lending relationship continued, a vehicle identification list was used to track details of the vehicles being funded, the funding amounts, and the pay off dates. (Vehicle identification list attached to security agreement for: L.T.M. Auto Sales, Defs.' Ex. A; Auto Finance Group, Defs. Ex. M; M.P. Motors, Defs.' Ex. X; and Car Mart, Defs.' Ex. AJ.) The evidence indicated that the date of pay off indicated the date that the dealer either paid off the loan or exchanged a new title for the one held by SAIF, Inc. SAIF, Inc. used a note change record to keep track of any new advances or paydowns, the date of any changes, and the amount of the new interest payment. (Note change record attached to corresponding promissory note for: L.T.M. Auto Sales, Defs.' Ex. B; Auto Finance Group, Defs.' Ex. N; M.P. Motors, Defs.' Ex. Y; and Car Mart, Defs. Ex. AK.) Generally, the account manager and the dealer would initial each change on the note change record. The credible evidence showed that the interest payment amount indicated on the note change record was a combination of the interest charge, the vehicle inspection fee, and the account servicing fee set forth on the promissory note, sometimes reduced by an applicable percentage discount. The evidence demonstrated that each dealer willingly agreed to pay the principal, interest, account servicing fees, and vehicle inspection fees.

Baghaei worked as the account manager on Plaintiffs' accounts until Gary Tkacs took over. The evidence indicated that Baghaei conducted much of the business at the dealers' places of business. Accordingly, Baghaei visited the dealers to provide new

funding, to collect checks, and to provide or exchange titles.  The evidence indicated that the account manager entered any new fundings or pay downs of principal on the note change records in the field, and the account manager and dealers typically initialed each change on the note change record.  Further, the evidence showed that the account manager would update the vehicle identification list in the field.

The evidence demonstrated that SAIF, Inc.'s flooring program was competitive with other inventory financing companies.  The evidence indicated that several of the dealers had used other flooring plans.  Further, the evidence showed that SAIF, Inc. offered M.P. Motors a lower financing rate to match a competitor and gained its business as a result.  The evidence also demonstrated that SAIF, Inc.'s flooring plan provided advantages over some of the larger inventory financing companies.  SAIF, Inc. provided more personal service and more flexibility to the dealers.  Baghaei came to the dealerships at least twice a month, and as Parviz Ghadimi testified, Baghaei spoke the same language as the dealers and understood their backgrounds, which provided a level of comfort to the dealers.  Moreover, SAIF, Inc. offered dealers the option to pay off the loan when it became due or they could "rebook" the loan and exchange new titles for the old ones.  Thus, under SAIF, Inc.'s program, dealers did not necessarily have to pay off the loan when due.  Also, SAIF, Inc. did not require dealers to pay off sold cars until the next visit from the account manager, whereas some competitors required pay off within 48 hours of a car being sold.  These SAIF, Inc. practices provided a substantial benefit to dealers.

The evidence showed that each new funding correlated to new vehicles and, as indicated above, that Plaintiffs and the account manager generally initialed the note change record for each new advance.  Accordingly, the evidence demonstrated that each new funding constituted a new loan agreement between the parties.  Substantial evidence demonstrated that the dealerships willingly agreed to the finance charges and fees as reflected in the original promissory notes, the vehicle identification lists, each note change record, and the checks paid by the dealers for the flooring plan.

The evidence indicated that SAIF, Inc. had written policies and procedures for new and existing dealers. (Defs.' Ex. BY.) Sterling testified that these written policies had evolved over time. Sterling testified that SAIF, Inc. instituted vehicle inspection and account servicing procedures to reduce risk related to inventory financing. Sterling testified that SAIF, Inc. would look at the dealers' practices, and in particular at how often they turned over their inventory, in determining whether to initially fund a dealer. He testified that the quicker the dealers turned over their inventory, the better chance they would have of securing financing from SAIF, Inc. and making a profit from their used car sales. Sterling testified that the initial vehicle inspection required a verification of the car's vehicle identification number and verification that the car matched the title. Subsequent inspections involved verification that the same vehicles made up the dealer's inventory. Sterling testified that SAIF, Inc.'s policies required inspections twice a month.

Baghaei testified regarding the account servicing and the initial and subsequent vehicle inspections. As to account servicing, Baghaei testified that he conducted nearly all business at the dealers' locations, and thus SAIF, Inc.'s program provided dealers with personal service. He picked up titles and checks, he executed note changes with the dealers on the note change records, and he updated the vehicle identification lists for each dealer. The evidence demonstrated that he visited the dealerships at least twice a month and that he spoke the same language as the dealers and understood their backgrounds. Moreover, as noted above, the credible evidence showed that SAIF, Inc.'s account servicing provided flexibility to the dealers. SAIF, Inc. offered dealers the option of rebooking their loans rather than paying them off when due. Further, SAIF, Inc. did not require dealers to pay off sold cars until the next visit from the account manager, whereas some competitors required pay off within 48 hours of a car being sold. As indicated above, these SAIF, Inc. practices provided significant benefit to the dealers.

Regarding the inspections, Baghaei described the initial inspection that he would conduct with regard to new fundings. He stated that he would look at cars on a lot, and he explained that he would look at titles to see if they matched the cars on the lot. He stated that he did not conduct a thorough inspection of the title documents to determine if a title was clear. He stated that he looked at the vehicle identification numbers as he walked by the cars on his way into the dealers' offices. He testified that he would attempt to memorize the last few digits of the vehicle identification numbers on the cars and would try to match the numbers to the titles. He stated that the length of the inspection could be very short if the dealer had a history with SAIF, Inc., as he developed a level of trust with the dealers. He testified that he did not need keys to perform the inspections because the inspection only involved looking at the vehicle and was not a mechanical inspection. Regarding subsequent inspections, Baghaei testified that he looked at the cars on the lot to check if any were different from his last visit.

The evidence also demonstrated that SAIF, Inc. took over the inventory financing business of Secured Assets of California and became its successor in interest.[1] Thus, although the earlier documents referred to Secured Assets of California rather than SAIF, Inc., the Court refers to SAIF, Inc. throughout.

**2.      Financing Records for Each Dealer**

  **A.      Manal Naoom, d/b/a L.T.M. Auto Sales**

The evidence showed that Manal Naoom and Thomas Sterling executed a Security and Buy Back Agreement "for the benefit of Secured Assets of California a management company under contract to Secured Assets Income Funds, (SAIF), a subsidiary of Secured Assets, Inc., a Nevada Corporation, (hereinafter referred to as 'SAC' or 'purchaser') located at 119 N. El Camino Real, #147, Encinitas, CA, 92024" and LTM Auto Sales. (Defs.' Ex. A.) The agreement states that "Secured Assets of

---

[1] For example, Sterling testified that Secured Assets of California and SAIF, Inc. used the same Secured Assets Trust Account, which was opened in the late 1990s. Further, he testified that SAIF, Inc. did not have any loans on some of its early balance sheets because Secured Assets of California was doing business before SAIF, Inc. obtained its license.

California," located at 119 N. El Camino Real, Suite #147, Encinitas, CA 92024, and "LTM Auto Sales/Manal Naoom" are authorized agents. (Id.) The agreement was signed by Thomas Sterling as V.P. of Secured Assets of California and Manal Naoom as owner on April 11, 2000. (Id.) A vehicle identification list is attached to the agreement. (Id.) The vehicle identification list contains vehicle makes, models, years, miles, and the last four digits of the vehicle identification number for each vehicle, as well as corresponding fund amounts, fund dates, and pay off dates. (Id.) An initial funding/net pay-out schedule for L.T.M. Auto Sales is also attached to the agreement. (Id.) This schedule, dated April 11, 2000, indicates a promissory note amount of $65,300, less prepaid interest of $1240.70, UCC-1 filing fees of $75, escrow setup fees of $150, credit & notary charge of $55, and a note origination fee of $165, for total initial charges of $1685.70, leaving a net advance of $63,614.30. (Id.)

The evidence also indicated that L.T.M. Auto Sales entered into a promissory note with Secured Assets of California on April 11, 2000. (Defs.' Ex. B.) The note indicates principal in the amount of $65,300; a monthly installment of $1959; a maturity date of October 15, 2000; interest of .84 percent per month, 10.08 percent per year; 1.08 percent per month vehicle inspection fee; and account servicing fee of 1.08 percent per month. (Id.) Manal Naoom signed the note as owner. (Id.) A note change record is attached to the note, indicating renewal dates, principal changes, new balances, and new interest payments. (Id.)

Additionally, Manal Naoom signed an Absolute Guaranty of Payment of Obligation with Secured Assets of California on April 11, 2000. (Defs.' Ex. D.) The evidence also included numerous checks correlating to each new advance. (Defs.' Ex. E.)

The evidence contained checks to and from LTM Auto Sales beginning in April of 2000 and concluding in June of 2004. Exhibit H-1 reflects the vehicle inspection and account servicing fees requested by SAIF, Inc. Considering all of the evidence, the

1  court concludes that the parties' final spreadsheets[2] accurately summarize the

2  transactions.  (Defs.' Ex. H-3; Pls.' Ex. 117-1(a).)

3            **B.    Afshin Kashani, d/b/a Auto Finance Group**

4            The evidence indicated that Afshin Kashani and Thomas Sterling executed a

5  Security and Buy Back Agreement on October 23, 2001 "for the benefit of Secured

6  Assets of California a management company under contract to Secured Assets Income

7  Funds, (SAIF), a subsidiary of Secured Assets, Inc., a Nevada Corporation, (hereinafter

8  referred to as 'SAC' or 'purchaser') located at 119 N. El Camino Real, #147, Encinitas,

9  CA, 92024" and Auto Finance Group, located at 7474 University Ave., La Mesa, CA,

10 91941.  (Defs.' Ex. M.)  The agreement states that "Secured Assets Income Funds,"

11 located at 119 N. El Camino Real, PMB-147, Encinitas, CA 92024, and "Auto Finance

12 Group" are authorized agents.  (Id.)  Thomas Sterling signed as Senior V.P. of Secured

13 Assets and Afshin Kashani signed owner.  (Id.)  A vehicle identification list is

14 attached to the agreement.  (Id.)  The vehicle identification list contains vehicle makes,

15 models, years, miles, and the last four digits of the vehicle identification number for

16 each vehicle, as well as corresponding fund amounts, fund dates, and pay off dates.

17 (Id.)

18            The evidence also indicated that Auto Finance Group entered into a promissory

19 note with Secured Assets of California on October 23, 2001.  (Defs.' Ex. N.)  The note

20 indicates principal in the amount of $30,000; a monthly installment of $900; a maturity

21 date of April 23, 2002; interest of .84 percent per month, 10.08 percent per year; 1.08

22 percent per month vehicle inspection fee; and account servicing fee of 1.08 percent per

23 month.  (Id.)  Afshin Kashani signed the note.  (Id.)  A note change record is attached

24 to the note, indicating renewal dates, principal changes, new balances, and new interest

25 ─────────────

26 [2] Defendants filed their revised spreadsheets on December 15, 2006.  (Doc. No.
   243.)  The Court marks Defendants' revised spreadsheets as follows: LTM Auto Sales,
   Defs.' Ex. H-3; Auto Finance Group, Defs.' Ex. S-3; M.P. Motors, Defs.' Ex. AE-4;

27 and Car Mart, Defs.' Ex. AQ-4.  Similarly, Plaintiffs filed their final spreadsheets on
   December 15, 2006.  (Doc. Nos. 244-47.)   The Court marks Plaintiffs' revised

28 spreadsheets as follows: LTM Auto Sales, Pls.' Ex. 117-1(a); Auto Finance Group, Pls.'
   Ex. 117-1(b); M.P. Motors., Pls.' Ex. 117-1(c); and Car Mart, Pls. Ex. 117-1(d).

1   payments.  (Id.)  An initial funding/net pay-out schedule for Auto Finance Group is
2   attached to the note.  (Id.)  This schedule, dated October 23, 2001, indicates a
3   promissory note amount of $30,000, less prepaid interest of $210, escrow setup fees of
4   $150, credit & notary charge of $55, and a note origination fee of $350, for total initial
5   charges of $790, leaving a net advance of $29,210.  (Id.)

6       Additionally, Afshin Kashani signed an Absolute Guaranty of Payment of
7   Obligation with Secured Assets of California on October 23, 2001. (Defs.' Ex. O.) The
8   evidence also included numerous checks correlating to each new advance. (Defs.' Ex.
9   P.)

10      The evidence contained checks to and from Auto Finance Group beginning in
11  October of 2001 and concluding in June of 2004.[3]  Exhibit S-1 reflects the vehicle
12  inspection and account servicing fees requested by SAIF, Inc.  Considering all of the
13  evidence, the court concludes that the parties' final spreadsheets accurately summarize
14  the transactions.  (Defs.' Ex. S-3; Pls.' Ex. 117-1(b).)

15      **C.    Parviz Ghadimi, d/b/a M.P. Motors**

16      The evidence indicated that Parviz Ghadimi and Thomas Sterling executed a
17  Security and Buy Back Agreement on October 20, 2000 "for the benefit of Secured
18  Assets of California a management company under contract to Secured Assets Income
19  Funds, (SAIF), a subsidiary of Secured Assets, Inc., a Nevada Corporation, (hereinafter
20  referred to as 'SAC' or 'purchaser') located at 119 N. El Camino Real, #147, Encinitas,
21  CA, 92024" and "M.P. Motor" located at 147 Broadway, Chula Vista, CA 91910.
22  (Defs.' Ex. X.) The agreement states that "Secured Assets of California," located at 119
23  N. El Camino Real, #147, Encinitas, CA 92024, and "Parviz Ghadimi DBA M.P.
24  Motors" are authorized agents. (Id.) Thomas Sterling signed as Senior V.P. of Secured
25  Assets of California and Parviz Ghadimi signed as owner. (Id.) A vehicle identification

26  _____

27      [3] The Court notes that Afshin Kashani testified that Auto Finance Group
    incorporated in July of 2004, which was after Plaintiffs initially filed this suit in state
    court in June of 2004.  The parties did not present any other evidence relating to the
28  formation of Auto Finance Group, Inc.  Accordingly, the Court will refer to the liability
    of Afshin Kashani d/b/a Auto Finance Group for this accounting.

list is attached to the agreement. (Id.) The vehicle identification list contains vehicle makes, models, years, miles, and the last four digits of the vehicle identification number for each vehicle, as well as corresponding fund amounts, fund dates, and pay off dates. (Id.)

The evidence also indicated that M.P. Motors entered into a promissory note with Secured Assets of California on January 11, 2001. (Defs.' Ex. Y.) The note indicates principal in the amount of $49,180; a monthly installment of $1279.18; a maturity date of July 11, 2001; interest of 1.0 percent per month, 12 percent per year; 1.7 percent per month vehicle inspection fee; and account servicing fee of 0 percent per month. (Id.) Parviz Ghadimi signed the note. (Id.) A note change record is attached to the note, indicating renewal dates, principal changes, new balances, and new interest payments. (Id.) An initial funding/net pay-out schedule for M.P. Motors is attached to the note. (Id.) This schedule, dated January 11, 2001, indicates a promissory note amount of $49,180, less prepaid interest of $810, UCC-1 filing fees of $75, escrow setup fees of $150, credit & notary charge of $55, and a .25% note origination fee of $122.95, for total initial charges of $1213.10, leaving a net advance of $47,966.90. (Id.)

Additionally, Parviz Ghadimi signed an Absolute Guaranty of Payment of Obligation with Secured Assets of California on December 15, 2000. (Defs.' Ex. AA.) The evidence also included numerous checks correlating to each new advance. (Defs.' Ex. AB.)

The evidence contained checks to and from M.P. Motors beginning in January of 2001 and concluding in June of 2004. Exhibit AE-1 reflects the vehicle inspection and account servicing fees requested by SAIF, Inc. Considering all of the evidence, the court concludes that the parties' final spreadsheets accurately summarize the transactions. (Defs.' Ex. AE-4; Pls.' Ex. 117-1(c).)

### D.   Mehran Khomamizadeh, d/b/a Car Mart

The evidence indicated that Mehran Khomamizadeh and Thomas Sterling executed a Security and Buy Back Agreement on March 22, 2003 "for the benefit of

SAIF, Inc. a lending company under contract to Secured Assets Income Funds, (SAIF), a Nevada Corporation, (hereinafter referred to as 'SAIF' or 'purchaser') located at 119 N. El Camino Real, #147, Encinitas, CA, 92024" and Car Mart, located at 7640 El Cajon Blvd., La Mesa, CA, 91941.  (Defs.' Ex. AJ.)  The agreement states that "SAIF, Inc.," located at 119 N. El Camino Real, PMB #147, Encinitas, CA 92024, and "Car Mart" are authorized agents.  (Id.)  Thomas Sterling signed as Senior V.P. of SAIF, Inc. and Mehran Khomamizadeh signed as owner.  (Id.)  A vehicle identification list is attached to the agreement.  (Id.)  The vehicle identification list contains vehicle makes, models, years, miles, and the last four digits of the vehicle identification number for each vehicle, as well as corresponding fund amounts, fund dates, and pay off dates. (Id.)

The evidence also indicated that Mehran Khomamizadeh signed a promissory note as owner on behalf of Auto Credit on December 1, 2001.  (Defs.' Ex. AK.) Further, the credible evidence indicated that Khomamizadeh and Car Mart assumed the note around the beginning of 2003.  (See also id. (Auto Credit crossed out and replaced with Car Mart).)  The note indicates principal in the amount of $120,000; a monthly installment of $3600; a maturity date of June 1, 2002; interest of .84 percent per month, 10.08 percent per year; 1.08 percent per month vehicle inspection fee; and account servicing fee of 1.08 percent per month.  (Id.)  A note change record is attached to the note, indicating renewal dates, principal changes, new balances, and new interest payments.  (Id.)  The first note change is dated April 15, 2002 and indicates a new advance of $30,000,  bringing the principal balance to $150,000.  (Id.)

Additionally, Mehran Khomamizadeh signed an Absolute Guaranty of Payment of Obligation with SAIF, Inc. on March 22, 2003. (Defs.' Ex. AM.) The evidence also included numerous checks correlating to each new advance on the note change, some made out to Auto Credit, with later checks made out to Car Mart.  (Defs.' Ex. AN.)

The evidence contained checks to and from Car Mart beginning in December of 2001[4] and concluding in June of 2004.  Exhibit AQ-1 reflects the vehicle inspection and account servicing fees requested by SAIF, Inc.  Considering all of the evidence, the court concludes that the parties' final spreadsheets accurately summarize the transactions.  (Defs.' Ex. AQ-4; Pls.' Ex. 117-1(d).)

**3.     Usury**

As noted, the Court concludes that the final spreadsheets accurately summarize the transactions between SAIF, Inc. and the dealers.  SAIF, Inc. is entitled to recover the principal owed by each Plaintiff as indicated on the spreadsheets.  Further, as indicated above, Plaintiffs do not challenge the 10.08% interest rate stated on the promissory notes.  Thus, SAIF, Inc. is also entitled to recover its interest on the principal amounts.  Plaintiffs do contend, however, that the account servicing fees and vehicle inspection fees are usurious interest charges.

**A.     Elements of Usury**

California's law regarding excessive interest rates is set forth in the Usury Law, an uncodified ballot initiative first adopted in 1918.  See West's Annotated Cal. Civ. Code §§ 1916-1 et seq.; see also Fox v. Peck Iron and Metal Co., 25 B.R. 674, 690-91 (Bankr. S.D. Cal. 1982).  The Usury Law provides for forfeiture of usurious interest and also provides for the civil recovery of treble interest payments under certain circumstances. Id. §§ 1916-2, 1916-3.  The maximum legal interest rate is now set forth in Article XV of the California Constitution, which provides that parties may contract for a rate of interest up to the greater of ten percent per year or five percent per year over the discount rate of the Federal Reserve Bank of San Francisco.  Cal. Const. Art. XV, § 1.

Usury contains four elements: "(1) The transaction must be a loan or forbearance; (2) the interest to be paid must exceed the statutory maximum; (3) the loan and interest

---

[4] The initial transactions referred to Auto Credit, but as noted, Mehran Khomamizadeh d/b/a Car Mart assumed the note previously in the name of Auto Credit in the beginning of 2003, and subsequent checks referred to Car Mart.

must be absolutely repayable by the borrower; and (4) the lender must have a willful intent to enter into a usurious transaction." Ghirardo v. Antonioli, 8 Cal. 4th 791, 798 (Cal. 1994). Regarding the intent element, the "'conscious and voluntary taking of more than the legal rate of interest constitutes usury and the only intent necessary on the part of the lender is to take the amount of interest he receives; if that amount is more than the law allows, the offense is complete.'" Id. (quoting Thomas v. Hunt Mfg. Co., 269 P.2d 12, 16 (Cal. 1954)). A two year statute of limitations applies to affirmative actions to recover usurious interest payments. See, e.g., Stone v. James, 142 Cal. App. 2d 738, 740 (1956). A one year statute of limitations applies to affirmative actions for treble damages. See West's Annotated Cal. Civ. Code § 1916-3; see also Handi Inv. Co. v. Mobil Oil Co., 653 F.2d 391, 393 (9th Cir. 1981). Further, whether to award treble damages is left to the discretion of the trial court. In re Pillon-Davey & Assocs., 52 B.R. 455, 462 (Bankr. N.D. Cal. 1985). Where the lender sues on the indebtedness, however, all usurious payments may be set off in reduction of the principal, regardless of whether the statute of limitations on the borrower's affirmative remedy has run. See, e.g., Shirley v. Britt, 152 Cal. App. 2d 666, 670 (1957).

**B.     Time Period During which SAIF, Inc. Was Exempt from Usury Laws**

California Finance Code § 22002 creates a class of persons exempt from California's usury laws. Relevant here, the provision exempts "lenders formerly regulated by California's Commercial Finance Lenders Law." Cal. Fin. Code § 22002. The commercial lenders to which this provision refers are now regulated by the California Finance Code. See, e.g., id. § 22001. SAIF, Inc. contends that all commercial finance lenders are exempt from the usury laws, regardless of whether they hold a commercial lending license. A fair reading of the applicable statutory provisions, however, indicates that only licensed commercial finance lenders are exempt. Looking at the current regulations, the finance code expressly states that "[n]o person shall engage in the business of a finance lender or broker without obtaining a license from the commissioner." Id. § 22100. Accordingly, because the statute requires

1  a lender to obtain a license before engaging in finance lending, only a licensed
2  commercial lender may claim the protection of the statutory usury exemption, as an
3  unlicensed commercial finance lender operates outside the scope of the statute.  This
4  conclusion is strengthened by additional statutory language.  The exemption provision
5  states that the exemptions are created to accomplish the finance code's purposes and
6  policies.  <u>Id.</u> § 22002.  The finance code sets forth specific purposes and policies,
7  including, "[t]o protect borrowers against unfair practices by some lenders, having due
8  regard for the interests of legitimate and scrupulous lenders."  <u>Id.</u> § 22001.  Exempting
9  unlicensed commercial lenders from the usury laws would not serve to protect
10 borrowers from unfair practices, and thus, would frustrate one of the finance code's
11 stated policies.  Accordingly, the loans SAIF, Inc. entered into when it lacked a lending
12 license are subject to the usury laws.

13      The credible evidence at trial indicated that SAIF, Inc. held a California Finance
14 Lender's license from September 5, 2002 to May 13, 2003.  Thus, loans it made during
15 that time are exempt from the usury laws.   As indicated above, the evidence
16 demonstrated that each new funding constituted a new loan agreement between the
17 parties.  Accordingly, new advancements SAIF, Inc. made while licensed are exempt
18 from the usury laws.

19         **C.     Usurious Provisions**

20      Whether a transaction is usurious is a mixed question of law and fact.  <u>See</u>
21 <u>Ghirardo</u>, 8 Cal. 4th at 800 ("Once the historical facts of the transaction are determined,
22 the question of whether *that type of transaction* is subject to the usury proscription is
23 a question of law." (emphasis in original)).  Where a transaction is not usurious on its
24 face, courts may look at the substance of the transaction to determine if the interest
25 charges are legal.  <u>Mission Hills Dev. Corp. v. Western Small Bus. Inv. Co.</u>, 67 Cal.
26 Rptr. 505, 506 (Cal. Ct. App. 1968)  "The courts will not permit an evasion of the usury
27 law by a subterfuge, and it is always permissible to show that a transaction ostensibly
28 lawful is in fact a usurious loan."  <u>Id.</u>

"The word 'interest' as used in the usury law includes any bonus, commission, or any other form of compensation paid to the lender for the use of the money borrowed, but it does not include expense items for investigating, appraising, inspecting and otherwise servicing the loan." Cambridge Dev. Co. v. U. S. Financial, 90 Cal. Rptr. 333, 335 (Cal. Ct. App. 1970). Thus, a lender may charge extra and reasonable amounts for incidental services, expenses, or risks in addition to lawful interest, but the fees must not be for the loan of money. See e.g., Klett v. Sec. Acceptance Corp., 38 Cal. 2d 770, 788 (1952) ("Legitimate charges for specific items of actual service and expense are not . . . compensation for the loan of money; i.e., such charges are not interest[.]"). "Such items, however, must be confined to specific service or expense incidental to the loan incurred in such a way as to preclude it being a device through which additional interest or profit on the loan may be exacted." Id. at 787-88. Accordingly, courts must determine whether an additional charge is a legitimate fee for expenses incidental to the loan or whether it is simply disguised interest. Cambridge Dev. Corp., 90 Cal. Rptr. at 335. Courts must look to all the facts related to a transaction, "not merely to the fact the charge was stated as a lump sum or as a percentage of the total loan." Id.

Considering all the evidence at trial, the Court concludes that the vast majority of the account servicing fees are valid "expense items for investigating, appraising, inspecting and otherwise servicing the loan." Id. The totality of the evidence demonstrated that SAIF, Inc. conducted nearly all business at the dealers' locations, and thus SAIF, Inc.'s program provided dealers with personal service. Baghaei picked up titles and checks, he executed note changes with the dealers on the note change records, and he updated the vehicle identification lists for each dealer. The evidence demonstrated that he visited the dealerships at least twice a month. As Parviz Ghadimi testified, Baghaei spoke the same language as the dealers and understood their background, which provided a level of comfort for the dealers. Moreover, as noted above, the credible evidence showed that SAIF, Inc.'s account servicing provided flexibility to the dealers. SAIF, Inc. offered dealers the option of exchanging titles

rather than paying off the loans when due.  Further, SAIF, Inc. did not require dealers to pay off sold cars until the next visit from the account manager, whereas some competitors required pay off within 48 hours of a car being sold.  In sum, the majority of the account servicing fees provided for considerable benefits to the dealers, and the charges correlate to valid expense items for servicing the loans.  Additionally, as described below, while Defendants conducted some vehicle inspections, the Court combines the legitimate inspection fees in with the account servicing fees and allows all of the account servicing fees, but disallows all of the vehicle inspection fees.

As to the majority of the vehicle inspection fees, Plaintiffs have met their burden in showing that the 1.08% per month charge is not justified by the evidence of inspections, and thus it is not a legitimate charge confined to a specific expense item incidental to the loan.  <u>See</u> <u>Cambridge Dev. Corp.</u>, 90 Cal. Rptr. at 335.  Accordingly, the majority of the vehicle inspection fees amount to usurious interest charges.  While the credible evidence showed that SAIF, Inc. conducted some inspections, the evidence demonstrated that inspections were infrequent and many involved simply observing the vehicles on each dealer's lot.  The inspections became especially short after the dealers gained the trust of Baghaei.  Further, SAIF, Inc. did not keep specific records of inspections.  Thus, the majority of the 1.08% per month vehicle inspection fees amount to disguised interest charges, as they are additional fees charged to Plaintiffs for the loans, unrelated to any legitimate expenses for investigation.  <u>See, e.g.</u>, <u>Klett</u>, 38 Cal. 2d at 787-88.  Accordingly, the Court combines the few legitimate inspection fees into the account servicing fees as noted above, but does not allow any of the vehicle inspection fees.

The Court also heard from Plaintiffs' expert, Mark Daniel Close, regarding interest and fees.  He testified that SAIF, Inc. characterized the monthly interest, account servicing fees, and vehicle inspection fees as interest on certain documents.  Further, he testified that SAIF, Inc.'s financial documents were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP").  On cross

examination, however, he conceded that SAIF, Inc.'s documents were not misleading and that SAIF, Inc. was not required to prepare its financial documents in accordance with GAAP.

After hearing all the testimony, considering the credibility of witnesses, receiving the exhibits, and listening to the arguments of counsel, the Court GRANTS in part and DENIES in part Plaintiffs' requests for deductions in the amounts owed. Accordingly, the concludes that Plaintiffs are liable for the 10.08% interest on principal, the 1.08% account servicing fees, but not the 1.08% additional charges for vehicle inspections fees when SAIF, Inc. did not have a lender's license.

Finally, in its discretion, the Court declines to allow treble damages for the year prior to Plaintiffs' suit. The evidence clearly demonstrated that SAIF, Inc. ran a competitive inventory financing program. As to M.P. Motors, for example, SAIF, Inc. lowered its financing charges to gain the dealer's business. Further, the dealers all willingly agreed to pay the principal, interest, and fees listed on the promissory notes. The evidence demonstrated that SAIF, Inc.'s program offered dealers some advantages over other flooring programs, and it showed that SAIF, Inc.'s program was competitive with other lenders. Thus, the evidence did not indicate that anything was necessarily improper with SAIF, Inc.'s program. There was no evidence SAIF, Inc. willfully violated the usury laws, and SAIF, Inc.'s written policies contained provisions related to initial and subsequent vehicle inspections. Plaintiffs all participated in SAIF, Inc.'s flooring program for several years, and in fact, some dealers agreed to additional funding immediately prior to filing suit against SAIF, Inc. Evidence also demonstrated that the market for selling used cars became less favorable to the dealers in the period leading up to the filing of this suit. Finally, the evidence demonstrated that SAIF, Inc. temporarily lost its lending license through inadvertence. Therefore, the Court determines that treble damages are not appropriate.

**4.      Total Amount Owed by Each Plaintiff**

Each side presented a witness to summarize the transactions. Danielle Rauto

prepared spreadsheets and testified for Defendants.   Emebet Selassie prepared spreadsheets and testified for Plaintiffs.  The parties have provided the Court with spreadsheets setting forth the total amount of principal owed by each Plaintiff, combined with interest and account servicing fees, but with charges for vehicle inspections removed for the periods when SAIF, Inc. was not licensed.  (See Defs.' Exs. H-3, S-3, AE-4, & AQ-4; Pls.' Exs. 117-1(a)-(d).)  Further, because Plaintiffs paid vehicle inspection fees throughout the lending periods, any vehicle inspection payments made while SAIF, Inc. did not have a license are credited as principal paydowns.  (Id.) Accordingly, because of the reduced principal balance, the corresponding monthly payments for interest and account servicing are also reduced.  (Id.)  The Court has ordered further briefing regarding prejudgment interest and attorneys' fees, and thus, the totals below do not reflect any amounts for either prejudgment interest or attorneys' fees.

**Conclusion**

After hearing the evidence, evaluating the credibility and demeanor of the witnesses, reviewing all of the exhibits, and carefully considering the arguments of counsel, the Court concludes:

1.      Manal Naoom (d/b/a L.T.M. Auto Sales) is liable to SAIF, Inc. in the amount of $117,393.66;

2.      Afshin Kashani (d/b/a Auto Finance Group) is liable to SAIF, Inc. in the amount of $157,794.22;

3.      Parviz Ghadimi (d/b/a M.P. Motors) is liable to SAIF, Inc. in the amount of $206,008.74, potentially offset by any credit for amounts deposited with the Court if appropriate; and

4.      Mehran Khomamizadeh (d/b/a Car Mart) is liable to SAIF, Inc. in the amount of $255,105.00.

1    The Court has requested further briefing on prejudgment interest, attorneys' fees,

2  if any, and any potential offset from money deposited with the Court.

3    IT IS SO ORDERED.

4  DATED:  December 20, 2006

5

6  MARILYN L. HUFF, District Judge
   UNITED STATES DISTRICT COURT

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22  COPIES TO:

23  Richard S. Van Dyke
    Van Dyke & Associates
    Faraday Business Park
24  5741 Palmer Way, Suite B
    Carlsbad, CA 92008
25

26  Richard P. Miller
    Robert Reynolds
    Law Offices of Richard P. Miller
27  2207 Garnet Avenue, Suite N
    San Diego, CA 92109
28

- 20 -